## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No.: 22-cv-0202

**JAX FELDMANN,**

Plaintiff,

v.

**THE CITY AND COUNTY OF DENVER, a Colorado home-rule municipality;**
**OFFICER DIEGO ARCHULETA, in his individual capacity;**
**OFFICER FERNANDO BENAVIDES, in his individual capacity;**
**OFFICER JOSEPH HECKENCAMP, in his individual capacity;**
**OFFICER CHRIS VALDERRAMA, in his individual capacity;**
**SERGEANT TIM HYATT; in his individual capacity;**
**OFFICER KYLE MCNABB; in his individual capacity;**
**OFFICER DEREK STREETER, in his individual capacity;**
**OFFICER TYLER CARROLL, in his individual capacity;**
**OFFICER CHRIS PARTON, in his individual capacity;**
**OFFICER COREY HAGAN, in his individual capacity;**
**OFFICER WEDNESDAY AVEDISIAN, in her individual capacity; and**
**SERGEANT MIKE O'NEILL, in his individual capacity**

Defendants.

---

## COMPLAINT AND JURY DEMAND

---

COMES NOW Plaintiff, Jax Feldmann, by and through his counsel of record, BAUMGARTNER LAW, LLC, and BEEM & ISLEY, P.C., and respectfully submits this Complaint against the Defendants, and alleges and avers as follows:

## JURISDICTION AND VENUE

1.      This action is brought pursuant to 42 U.S.C. §1983 and §1988, and the First, Fourth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §1331, §1343(a)(3) and (4), and the aforementioned statutory and constitutional provisions.

2.      Venue is proper in the United States District Court for the District of Colorado pursuant to 28 USC §1391(b) because the Defendants are citizens and residents of Colorado, and the events, acts, and/or omissions giving rise to this action occurred in Colorado.

## PARTIES

3.      Plaintiff, Jax Feldmann, is and was at all relevant times a citizen of the State of Colorado, residing and domiciled in Denver, Colorado.

4.      Defendant, The City and County of Denver (the "City"), is and was at all relevant times a Colorado home-rule municipality with final policy-making authority over the Denver Police Department ("DPD") and its police officers.

5.      At all relevant times, the City was responsible for supervising, enacting, and enforcing the DPD's conduct, policies, and practices; the absence of necessary policies and practices; and for the hiring, retention, supervision, and training of employees and agents of the DPD.

6.      Defendant, Officer Diego Archuleta ("Defendant Archuleta"), is and was at all relevant times a citizen of the State of Colorado, employed as a police officer for the City, and acting under color of state law and within the course and scope of his agency or employment with and/or the authorization of the DPD. Defendant Archuleta is named and sued herein in his individual capacity.

7.      Defendant, Officer Fernando Benavides ("Defendant Benavidez"), is and was at all relevant times a citizen of the State of Colorado, employed as a police officer for the City, and acting under color of state law and within the course and scope of his agency or employment with and/or the authorization of the DPD. Defendant Benavides is named and sued herein in his individual capacity.

8.      Defendant, Officer Joseph Heckencamp ("Defendant Heckencamp"), is and was at all relevant times a citizen of the State of Colorado, employed as a police officer for the City, and acting under color of state law and within the course and scope of his agency or employment with and/or the authorization of the DPD. Defendant Heckencamp is named and sued herein in his individual capacity.

9.      Defendant, Officer Chris Valderrama ("Defendant Valderrama"), is and was at all relevant times a citizen of the State of Colorado, employed as a police officer for the City, and acting under color of state law and within the course and scope of his agency or employment with and/or the authorization of the DPD. Defendant Valderrama is named and sued herein in his individual capacity.

10.     Defendant, Sergeant Tim Hyatt ("Defendant Hyatt"), is and was at all relevant times a citizen of the State of Colorado, employed as a police officer for the City, and acting under color of state law and within the course and scope of his agency or employment with and/or the authorization of the DPD. Defendant Hyatt is named and sued herein in his individual capacity.

11.     Defendant, Officer Kyle McNabb ("Defendant McNabb"), is and was at all relevant times a citizen of the State of Colorado, employed as a police officer for the City, and acting under

color of state law and within the course and scope of his agency or employment with and/or the authorization of the DPD. Defendant McNabb is named and sued herein in his individual capacity.

12.     Defendant, Officer Derek Streeter ("Defendant Streeter"), is and was at all relevant times a citizen of the State of Colorado, employed as a police officer for the City, and acting under color of state law and within the course and scope of his agency or employment with and/or the authorization of the DPD. Defendant Streeter is named and sued herein in his individual capacity.

13.     Defendant, Officer Tyler Carroll ("Defendant Carroll"), is and was at all relevant times a citizen of the State of Colorado, employed as a police officer for the City, and acting under color of state law and within the course and scope of his agency or employment with and/or the authorization of the DPD. Defendant Carroll is named and sued herein in his individual capacity.

14.     Defendant, Officer Chris Parton ("Defendant Parton"), is and was at all relevant times a citizen of the State of Colorado, employed as a police officer for the City, and acting under color of state law and within the course and scope of his agency or employment with and/or the authorization of the DPD. Defendant Parton is named and sued herein in his individual capacity.

15.     Defendant, Officer Corey Hagan ("Defendant Hagan"), is and was at all relevant times a citizen of the State of Colorado, employed as a police officer for the City, and acting under color of state law and within the course and scope of his agency or employment with and/or the authorization of the DPD. Defendant Hagan is named and sued herein in his individual capacity.

16.     Defendant, Officer Wednesday Avedisian ("Defendant Avedisian"), is and was at all relevant times a citizen of the State of Colorado, employed as a police officer for the City, and acting under color of state law and within the course and scope of her agency or employment with

and/or the authorization of the DPD. Defendant Avedisian is named and sued herein in her individual capacity.

17.     Defendant, Sergeant Mike O'Neill ("Defendant O'Neill"), is and was at all relevant times a citizen of the State of Colorado, employed as a police officer for the City, and acting under color of state law and within the course and scope of his agency or employment with and/or authorization of the DPD. Defendant O'Neill is named and sued herein in his individual capacity.

18.     At all relevant times, the acts and omissions of the individual Defendants were pursuant to the customs, policies, practices, procedures, supervision, and training of the City and the DPD.

## GENERAL ALLEGATIONS

### A.     Background Facts Central to Plaintiff's Claims and Injuries

19.     On or about May 30, 2020, there were protests and demonstrations occurring in the streets of Denver's downtown and Capitol Hill neighborhoods in response to the recent death of George Floyd and others who have died or suffered severe injuries at the hands of law enforcement officers and in support of policy reforms that would help reduce the arbitrary, unreasonable, and unjustified use of deadly and excessive force that disproportionally affects people of color.

20.     Plaintiff was walking to his car on the west sidewalk along the 1500 block of Grant Street to return home after working with some colleagues on a menu for a local restaurant.

21.     Plaintiff, however, was not engaged in any protests or demonstrations, nor was he engaged in any illegal activity such as rioting or looting. He was merely trying to get to his car to return home after attending a meeting for work.

22.     On the same night, a group of Denver police officers assigned to the "District Four Impact Team" (hereafter "D4 Impact Team") had been dispatched to the area in which Plaintiff was walking, ostensibly for the purpose of controlling illegal protests.

23.     The D4 Impact Team consisted of all of the individually named officers (collectively referred to as the "Defendant Officers"), and they were traveling around the area just east of downtown by way of a "Rapid Deployment Vehicle," which is a Denver police-marked pickup truck fitted with step rails on both sides and the rear of the truck.

24.     Unknown to Plaintiff, the Defendant Officers had been and were at the time engaged in a coordinated campaign of excessive use of force against any person they suspected of being a protester.

25.     As the Defendant Officers drove around the city mounted on the side of the truck, they were armed with "less lethal" weapons, such as pepper ball guns that resemble paintball guns, as well as 40-millimeter launchers, which shoot large plastic bullets at their targets.

26.     The Defendant Officers traveled to areas where people were engaged in protests, and when they arrived, they intentionally and in a coordinated manner aimed their less lethal weapons at the heads and faces of their targets. The Defendant Officers repeatedly targeted the heads and faces of peaceful protesters who were fleeing from the officers, not engaged in any illegal behavior, and posed no threat to the officers whatsoever.

27.     Not only did the Defendant Officers take such actions in the presence of each other, but they also acted through physical and verbal coordination.

28.     The Defendant Officers were engaged in ongoing use of illegal, unconstitutional excessive force, and none of the officers took any steps whatsoever to intervene to stop or mitigate the illegal conduct.

29.     During the D4 Impact Team's patrol on the night of May 30, 2020, a group of protesters was calmly and slowly marching west on Colfax Avenue at or near the intersection of Grant Street. At the time the D4 Impact Team arrived at their location, none of the protesters at that location were rioting or otherwise involved in any violent, dangerous or threatening behavior of any kind.

30.     Despite their clearly peaceful nature, at approximately 9:37 p.m., the D4 Impact Team sped up behind them with their overhead lights off, coming to a rapid stop.  All of the officers dismounted the side rails or exited the cab of the truck and began a coordinated attack on the protesters as they fled. At no time did any officer give a command to disperse.

31.     In reaction to the Defendant Officers' presence, the protesters dispersed and fled the scene.

32.     Even as the protesters fled and clearly posed no threat whatsoever, the Defendant Officers targeted and fired at their upper bodies, faces, and heads.

33.     During the time that the protesters were fleeing Defendant Hyatt was pointing out protesters for the Defendant Officers to shoot at.

34.     After the protesters fled the immediate area, the Defendant Officers of the D4 Impact Team verbally communicated that they would pursue the fleeing protesters.

35.     The D4 Impact Team remounted the running boards and the police truck continued west on Colfax Avenue and turned north onto Grant Street (driving in the opposite direction of

traffic).

36.     As the police truck turned north, some of the protesters who were on Grant Street fled north. Others who were near the Colorado Education Association ("CEA") building on the northeast corner of Colfax and Grant, fled through the CEA parking lot.

37.     As these protesters fled, the team not only continued to shoot at these remaining, fleeing protesters from their mounted positions on the sides of the truck, but they also fired pepper balls at the level of the protesters' heads and upper torsos.

38.     Plaintiff, who had by this time made his way to the northwest corner of Colfax Avenue and Grant Street, observed the team shooting at the fleeing protesters; and as the truck turned north onto Grant Street in front of him, he raised both of his arms with open hands and implored the officers, "We're all Americans."

39.     In response to Plaintiff's raised hands and completely innocuous statement, one of the Defendant Officers, Defendant Archuleta, who was mounted on the back of the truck, aimed his pepper ball gun at Plaintiff's head and face and shot Plaintiff directly in the eye as the police truck moved up the street and away from Plaintiff.

40.     Based on the Defendant Officers' relative positions on the truck, the type of weapons they were carrying, and body-camera footage from other Defendant Officers, Defendant Archuleta was the only person able to fire a pepper ball at Plaintiff.

41.     In addition, Defendant Archuleta was wearing a body camera, but it was not turned on at the time he shot Plaintiff, which was a violation of DPD policy.

42.     The shot hit Plaintiff directly in the tissue of his eyeball, and the globe of his eye exploded immediately.

43.     The application of force immediately permanently blinded Plaintiff's left eye and incapacitated him as he stumbled back to the nearby building where he fell to the ground and where a friend and others attended to him until an ambulance arrived.

44.     At no time did Plaintiff pose a threat to the Defendant Officers or any other person, and the gesture of raising both hands above his head, with palms open, could not have been interpreted as threatening in any way.

45.     Neither Defendant Archuleta nor any of the other Defendant Officers ever issued any orders to Plaintiff before shooting him.

46.     Plaintiff was also unarmed at the time he was shot.  In fact, Plaintiff was shot when his hands were out and visibly empty of any possible weapon.

47.     There were also no groups of active protesters or demonstrators, much less rioters, in the immediate area where Plaintiff was shot. The peaceful protesters had already dispersed and were running away from the officers at the time of the shooting.

48.     In    addition,    Plaintiff's    statement,    "We're    all    Americans," coupled with his visibly empty hands, was not threatening nor offensive to any person, including Defendant Archuleta or any of the other Defendant Officers.

49.     While Plaintiff was unarmed, non-threatening, and non-confrontational, Defendant Archuleta and the other Defendant Officers on the DPD vehicle were armed and fully outfitted in protective riot gear, and they were safely on-board the moving police vehicle that enabled Defendant Archuleta to approach, aim, shoot Plaintiff in the eye and incapacitate him, and quickly ride away without ever being at any risk of harm by Plaintiff.

50.     At the time Plaintiff was shot, the Mayor of Denver had issued a curfew that began at 8:00 p.m. The curfew, however, contained exceptions for certain necessary and essential employees, such as the police officers themselves.

51.     Plaintiff was shot, however, without first being contacted by Defendant Archuleta or any of the other Defendant Officers to advise him of the curfew or otherwise determine if he might have been exempt.

52.     Even if he were not exempt, the mere violation of a curfew, without more, does not justify shooting the violator in the head and eye with a hard projectile capable of inflicting serious injury.

53.     Plaintiff's surgeon later confirmed that the eye injury was consistent with an impact from a pepper ball. Plaintiff's surgeon also confirmed that he had treated multiple people for eye injuries caused by projectiles shot by officers or agents of the DPD. In fact, his surgeon was treating another person shot in the eye by Denver police officers when Plaintiff arrived the emergency room.

54.     In addition to shooting Plaintiff as alleged herein, Defendant Archuleta and another D4 Impact Team member, Defendant Streeter, also engaged in similar unwarranted, aggressive, and excessive behavior in the days before and after the shooting of Plaintiff.

55.     Body camera video footage from the early morning hours of June 1, 2020, showed Defendant Archuleta discharge pepper spray at a woman who was stuck in traffic with her window down and after she expressed her disapproval of how the police were controlling an unarmed crowd. He then walked away.

56.     On or about May 29, 2020, body camera video captured Defendant Streeter firing

multiple pepper balls at a passing car after the passenger leaned out of a passenger window and expressed his disdain for the police. Before that incident, body camera video showed Defendant Streeter fire a pepper ball in the direction of two men with whom he had just had a verbal exchange and ordered them to go home. One of the men was simply asking which side of the street he should be on. In yet another incident, Defendant Streeter and other officers with him fired pepper balls in the direction of a young female who was yelling obscenities while running away from them.

57.    Both Defendant Archuleta and Defendant Streeter were disciplined for using inappropriate force in those circumstances and failing to distinguish between individuals participating in illegal activity and those merely expressing discontent with police.

58.    Based on the circumstances, Defendant Archuleta shot at Plaintiff's head/eye for the purpose of immobilizing or incapacitating Plaintiff, and to punish, retaliate against, or silence Plaintiff because of the words he shouted and his perceived association with protesters who were demonstrating against police brutality and misconduct. Alternatively, Defendant Archuleta shot Plaintiff arbitrarily, "for sport," or for no reason at all except as a display of the Defendant Officers' authority and power.

59.    The previous coordinated attacks by the Defendant Officers against protesters who had already dispersed and were fleeing from the police as well as the specific incidents in which both Defendant Archuleta and Defendant Streeter used unnecessary force in the form of pepper spray or pepper balls against non-violent and non-threatening persons or protesters demonstrates that all of the Defendant Officers were operating in an ongoing concerted manner for the purpose of targeting and needlessly injuring perceived protesters.

60.    Furthermore, none of the other Defendant Officers took any action to stop the

unnecessary attacks, specifically including Defendant Archuleta's firing at Plaintiff, and they perpetuated a cover-up by failing or refusing to identify the officer who shot Plaintiff.

61.     Moreover, when questioned by internal affairs, each of the officers denied ever shooting at fleeing protesters, including shooting them in the head and upper body, and each of them denied witnessing their teammate officers commit these acts, despite the fact that each of them acted in coordination to do so.

62.     As a result, despite the fact that all surrounding evidence pointed to Defendant Archuleta, the DPD Internal Affairs investigation resulted in no disciplinary actions against Defendant Archuleta or any of the other Defendant Officers, much less any prosecution for criminal assault.

**B.     Factual Allegations Relating to The City's Customs, Policies, Practices, Procedures, Supervision, and Training**

63.     The City, through its Chief of Police and/or the Manager of Safety/Executive Director of Safety, had the ultimate decision- and policy-making power for the DPD and ultimate responsibility for training the DPD's police officers.

64.     Defendant Archuleta violated Plaintiff's constitutional rights as previously alleged.

65.     The protests against police brutality that were occurring at the time Plaintiff was shot in the eye with a pepper ball started two days earlier, on or about May 28, 2020, and continued almost daily into the middle of June.

66.     In response to the protests and demonstrations, the City, through its law enforcement agency, the DPD, dispatched its officers and officers from other agencies and jurisdictions into the streets of the City. These officers were outfitted in protective riot gear and were armed with "less-lethal" munitions, including chemical sprays (tear gas and pepper spray)

and hard potentially injurious projectiles, such as flashbang grenades, pepper balls, rubber bullets, and other kinetic impact projectiles ("KIPs"), that can be loaded into a gun or "launcher," aimed, and fired with precision at any target.

67.     From the very beginning of the protests, the City, including its decision-makers, the Mayor, the Chief of Police, and the Manager of Public Safety, had knowledge that the DPD had a custom of inflicting injury on protesters.

68.     For example, at or near the beginning of the protests, one Denver police officer posted a photograph on Instagram showing himself and two other officers dressed in riot gear with the caption, "Let's start a riot."

69.     According to media reports, this officer joined the DPD in October 2019 and would have completed the Department's 3.5-month-long field training program in January or February of 2020—just months before being assigned to the protests.

70.     In addition to the overt attitudes of its officers, the City had independent knowledge of DPD customs. In the first days of the protests, the City was inundated with complaints of excessive force against peaceful protesters.

71.     Conventional and social media overflowed with stories, images, and videos of peaceful protesters who were injured due to police violence against them. Many of these instances involved people, who, like Plaintiff, were injured by police with less lethal projectiles shot at their most sensitive body parts, including the face, head, and genitals.

72.     The following are among the many people targeted, shot, and injured by officers and agents of the DPD at or around the same date as Plaintiff:

<u>May 28, 2020</u>

    a.  Michael Acker (shot in the face causing lacerations to the eye and face);

    b.  Emily Heydt (shot multiple times in her hand and groin with pepper balls from short range while she was stopped on her motorbike behind a Denver SWAT truck);

<u>May 29, 2020</u>

    c.  Megan Matthews (shot in the face causing loss of consciousness, multiple lacerations to the head, a broken nose, and broken facial bones);

    d.  Gabriel Thorn (shot in the head);

    e.  Cameraman (name unknown) for Denver Channel 7 (shot four times in the chest while holding a camera to his face and shattering the lens to the camera);

    f.  Christopher Holland (shot in the wrist while holding a protest sign above his head resulting in bone bruising);

    g.  Ellektra Rowland (shot in the head resulting in a contusion);

    h.  Andy Sannier (shot in the chest while filming);

    i.  Gregory Trickle (targeted with laser sights in the face and groin);

<u>May 30, 2020</u>

    j.  Michael McDaniel (shot in the head);

    k.  Elizabeth Eps (shot in the eye and face, causing facial and eye wounds);

    l.  Shawn Murphy (shot in the eye and face, causing laceration to the face and detached retina requiring surgery);

    m.  Nicholas Orlin (shot in the head causing unconsciousness, broken facial bones, and loss of sight in left eye);

    n.  Alex Wolfson (shot directly in the eyeball causing a detached retina requiring surgery);

    o.  Russel Strong (shot in the face causing the loss of his right eye);

    p.  Dan Delany (shot in the back of the head while fleeing from officers rendering him unconscious and lacerating his scalp);

    q.  Brianna Barber (repeatedly shot in the face and head, including the sign she was holding above her head);

    r.  Scarlet Barnhill (shot in the face, hitting her eyeglasses);

    s.  James Sweetman (shot with pepper balls in the head and back, causing contusions);

    t.  Steven Fink (shot in the groin, causing a ruptured testicle);

May 31, 2020

    u.  Gabe Schlough (shot in the face and chest while helping a woman shot with a tear gas canister, causing a massive wound to his face);

    v.  Zachary Packard (shot in the face and head, causing a broken skull and jaw);

    w.  Yousef Amghar (shot in the head and chest while holding his hands up and chanting "hands up, don't shoot");

    x.  Alex Burness of *The Denver Post* (shot in the head and abdomen after he yelled, "Press!");

    y.  Darian Tindall (shot in chest while her hands were raised above her head);

z.  Trevor Hughes (shot in the finger, breaking and severing it and requiring reconstructive surgery);

aa. Ambrose Cruz (shot three times in the eye area causing his eye to be swollen shut, lacerations, and severe bruising of the face);

June 2, 2020

bb. Darrell Hampton (shot in the face while standing on a sidewalk filming).

73.    Each of the above examples involved the use of force by DPD officers and agents against peaceful protesters, observers, or members of the press, and none of the above people were given the required orders to disperse or otherwise given an opportunity to comply before being shot with less lethal weapons.

74.    Not a single officer has ever been disciplined for any of these serious attacks, demonstrating the City's approval of the officer's actions and the City's policy-in-fact of forceful suppression of peaceful protests.

75.    The violence against peaceful protesters was so widespread and harmful that it dominated all major media sources, including traditional and social media, and was the subject of numerous citizen complaints.  As a result, the City, including the Mayor and Chief of Police, knew about most, if not all, the above-alleged incidents.

76.    In fact, even in November of 2020, Denver police officers continued to act within this policy-in-fact of attacking non-threatening protesters. One example of this continued policy-in-fact occurred on November 4th, the day after the presidential election when Ariel Wolff was peacefully protesting on Colfax Avenue. When asked to leave by Denver police officers, he complied but was still shot in the back of the head with a hard pepper ball that left him with a

contusion and chemical burns to his eyes, throat, and mouth. In keeping with the City's policy-in-fact of violent and disproportionate use of force to suppress protests, no officer was disciplined for this conduct. The City's policy remains the same to this day.

77.     There are many more examples of the City's actual policy of suppressing peaceful protest, but the above cases are a representative sample of a policy that has been in place at least since the 2011 "Occupy" protests, addressed more fully below.

78.     The City's failure to supervise, discipline, train, or even reprimand officers for this consistent and now regular illegal use of force demonstrates that the City's leaders and decision-makers have accepted the customs that prevail within the DPD.

79.     The City's failure to constrain its officers in any way despite being aware of the many injuries its officers had caused and were causing during the protests is clear evidence of the City's utter and deliberate indifference to the customary use of excessive and disproportionate force toward protesters.

80.     In fact, on May 29, 2020, in the midst of ever-increasing reports of injuries to dozens of peaceful protesters, the City's decision-makers, including the Mayor and Chief of Police, publicly praised the DPD for its "tremendous restraint," stating that the Denver officers' use of less lethal weapons was proper.

81.     Such public praise by the City's decision-makers, not only ratified the officers' unconstitutional conduct, but also demonstrated the City's deliberate indifference to violations of the constitutional rights of protesters by DPD officers.

82.     Once again, the decision-makers were acutely aware of the injuries to citizens from less lethal weapons, and expressly ratified the actions of the officers.

83.     Furthermore, four citizen plaintiffs filed an action against the City on June 4, 2020, *Abay v. City of Denver*, that was subsequently removed to the United States District Court for the District of Colorado, Civ. Action No. 20-cv-01616-RBJ, and included allegations that the City, through its DPD officers, used and condoned the use of excessive force tactics against peaceful protesters, members of the media, and even third-parties in the vicinity of the protesters to punish them for demonstrating against police brutality and with the intention and/or effect of discouraging their and others' First Amendment right to free speech and expression.

84.     The *Abay* action resulted in the issuance of a temporary restraining order restricting the officers "from employing chemical weapons or projectiles of any kind against persons engaging in peaceful protests or demonstrations … unless an on-scene supervisor at the rank of Captain or above specifically authorizes such use of force in response to specific acts of violence or destruction of property that the command officer has personally witnessed." *Abay v. City of Denver*, 445 F.Supp.3d 1286, 1294 (D.Colo., June 5, 2020).

85.     Around the same time, the City's Executive Director of Safety, Murphy Robinson, sent a memorandum to Chief of Police, Paul Pazen, that referred to the recent protest activities and serious injuries caused by pepper balls and rubber-tipped rounds fired by 40-mm launchers. Mr. Robinson requested that the City immediately consider prohibiting the use of 40-mm launchers against any individuals in a crowd during any upcoming protests, that there be an internal review to determine whether such launchers are appropriate for crowd control, and that all DPD officers authorized to use pepper balls be reminded of their training, including that pepper balls may only be fired at the ground and not into a crowd of protesters. A copy of this memorandum is attached hereto and incorporated by reference herein as **Exhibit 1**.

86.     However, officers and agents of the DPD continued to indiscriminately use such weapons against protesters in defiance of the Court's Order, and the City continued to condone and ratify these actions through inaction for the duration of the protests, which continued through the summer.

87.     The allegations on which the restraining order in *Abay* was based are consistent with the attitude expressed in the now-terminated DPD officer's Instagram post and the findings of the OIM report that a policy, practice, and/or custom existed in the DPD that condoned or was callously indifferent to the use of unnecessary and excessive force by its officers against its own citizens.

88.     It simply cannot be said that the City was unaware of its officers' conduct while the protests were occurring.

89.     The Denver Office of the Independent Monitor ("OIM") also found many problems with the DPD's use of force in a detailed report concerning the DPD's response to the 2020 protests. The OIM report cited observations of DPD officers consistently using less-lethal munitions in troubling ways, specifically including the following:

  a. Failing to issue orders to disperse in the vast majority of instances before deploying less lethal munitions;

  b. Deploying pepper ball rounds at persons who were verbally objecting to police behavior and not engaged in apparent physical resistance;

  c. Deploying pepper ball rounds and other projectiles that nearly or directly impacted prohibited areas of the body, including the head, face, and groin;

  d. Continuing to deploy chemical, gas, impact, or explosive munitions after their

use had already caused people to disperse and leave an area; and

e.   Failing without good cause to turn on body cameras in the overwhelming majority of incidents in which the officers deployed less lethal weapons.

90.     The OIM report found that not all officers using projectile launchers, including pepper ball and 40mm launchers, were trained and certified in using such weapons, and it recommended that the DPD implement standards to specify and ensure that only authorized officers may use such weapons during crowd-control events.

91.     With respect to mutual aid/assistance from other jurisdictions, the OIM report found that officers from other jurisdictions had used the following types of weapons and ammunition against protesters:  (1) at least 73 rounds of rubber-ball projectiles/pellets; (2) more than 150 "less-lethal" shotgun rounds, which can be aimed and fired like traditional shotguns and which can also be mistakenly loaded with and fire lethal ammunition; and (3) more than 200 rounds of "beanbags" filled with lead shot.  According to the report, the Use of Force Policy and Crowd Management Manual of the DPD did not address the use of such weapons and ammunition one way or the other.

92.     The OIM report not only recommended that the DPD develop agreements, procedures, and command control structures for working with other jurisdictions, but also that the DPD require its mutual aid partners to adhere to DPD's policies and use only the weapons and ammunition approved by the DPD.

93.     The OIM report also found problems with internal tracking and logging of the use of less-lethal weapons during crowd control events; insufficient requirements and policies regarding the wearing and use of body cameras during such events; insufficient supervision and

review of officers and corresponding use of force during crowd control operations; failure of officers and supervisors to issue dispersal orders before using force to disperse crowds; lack of sufficient enforcement regarding the prominent display of officers' badge numbers; and allowing untrained or insufficiently trained officers to use "less-lethal" weapons, including pepper ball launchers and other projectile weapons, during crowd control operations.

94.     The OIM report also found that there was no guidance for high-risk explosive devices, such as rubber-ball grenades and noise-flash diversionary devices ("NFDDs"), and it identified inappropriate and/or insufficient standards for the use of pepper ball projectiles or "direct-fired" pepper balls. Specifically, the report found that the DPD has only one standard for using such pepper balls—defensive resistance—which is defined in the crowd control context as "physical actions by members of a crowd that constitute an unlawful assembly and/or disruption to pedestrian or vehicle traffic." The report continued, "This means that an officer may strike a person directly with pepper ball in response to nothing more than disrupting traffic. We believe that this standard is too low for direct-fired pepper ball use."

95.     In light of these findings, the OIM report made the following recommendations: that the DPD disallow the use of rubber-ball grenades during crowd control operations; that the DPD articulate clear and specific standards for when rubber-ball grenades and NFDDs may be used; that the DPD revise its standards for pepper ball use; and that direct-fired applications of pepper balls be limited only to circumstances in which a person displays active or aggravated active aggression.

96.     Specifically, the DPD Use of Force Policy explicitly states that these weapons can cause serious bodily injury or death and can only be used to prevent a subject/targeted person from

physically harming officers, other civilians, or themselves.

97.     However, the DPD Crowd Control Manual simultaneously allows officers to use the same less lethal weapons against members of a crowd that constitutes an unlawful assembly and/or disruption to pedestrian or vehicle traffic.

98.     Thus, the City's use of force policy as written unconstitutionally permits officers to use grossly disproportionate force against crowds, including protesters and perceived protesters, such as Plaintiff, for nothing more than impeding traffic.

99.     This policy, in itself, is certain to result in serious injuries to non-violent protesters. When the policy is coupled with the custom and ratification of failing to issue dispersal orders before firing such weapons and the custom of targeting particularly sensitive areas of the body, the City's retention and toleration of the policy and customs represents a clear and deliberate indifference to the violation of citizens' constitutional rights.

100.    The deficient policies in effect at the time of the protests in May and June of 2020, are found in the Force Related Polices of section 105 of the DPD Operations Manual (revised Jan. 27, 2019) and the DPD Crowd Management Manual (revised Feb. 13, 2019), and they are further identified and discussed in the OIM report, which is attached hereto and is incorporated by reference herein as **Exhibit 2**.

101.    Furthermore, the City failed to properly train its officers and agents on the constitutional limits of the use of force, specifically including the use of less lethal munitions during crowd control operations.

102.    The City's insufficient training on these matters is exhibited by the fact that an officer, who had just recently completed the City's officer training program, thought it appropriate

to publicly post on Instagram the admonition, "Let's start a riot," as the protests began. Furthermore, Defendant Archuleta, who had been with the DPD for four (4) years as of May 2020, had only received one (1) hour of crowd control training during his time at the Academy.

103.    The DPD's failure to properly train its officers and agents on the constitutional limits of using less lethal munitions, including direct-fired pepper balls, its implementation of inappropriate or insufficient policies, its failure to implement new or revised policies, standards, and guidance for its officers relating to the use of less lethal munitions during crowd control events, and its failure to correct DPD customs as set forth in the OIM report resulted in the officers' inappropriate and widespread direct-fire use of less lethal munitions, including pepper balls, against protesters and others perceived to be or associated with them.  Such inappropriate direct-fire use, including aiming and firing hard projectiles at people's heads, faces, and groin areas, was the cause of many serious injuries, including the permanent and disfiguring injuries to Plaintiff's eye.

104.    The policy, practice, custom, and/or lack of training that has led to the DPD's use of unnecessary and excessive force pre-existed the incident involving the Plaintiff and has been in place at the DPD for many years.  This policy, practice, custom, and/or lack of training applies to the unconstitutional treatment of individuals by DPD officers, as well as unconstitutional treatment of groups of protesters.

105.    In October 2011, DPD officers used "less lethal" munitions, including tear gas and pepper balls, against protesters involved in the "Occupy" demonstrations.  At least one civilian was struck in the face. Despite recommendations of the OIM that the DPD employ its Tactics Review Board ("TRB") to assess the tactics used during the clash with demonstrators, including

compliance with existing policies and procedures, and the need for any revisions to such policies and procedures, related training, and recommendations for crowd control tactics to improve outcomes for future demonstrations, the City declined to accept those recommendations.

106.    In January 2017, the OIM again highlighted several noteworthy deficiencies in the DPD's draft Use of Force Policy, including vague and poorly defined key provisions, lack of clarity for the overall standard for when force may be used, less restrictive standards for use of force as compared to other similar large police agencies in the country, and lack of adherence to national standards, including the definition of deadly force.

107.    There are dozens of additional documented claims and lawsuits against the City and/or its police officers going back well over ten years in which the City either paid settlements or had verdicts against it based on allegations of the use of unnecessary and excessive force against individuals in non-violent situations. Recently, Attorney David Lane compiled a list of just some of those incidents as an exhibit to a Complaint against the City captioned *Naphtali et al. v. City and County of Denver,* Case No. 1:20-cv-02198.  A version of Mr. Lane's exhibit is attached hereto and incorporated by reference herein as **Exhibit 3**.

108.    Furthermore, on May 30, 2020, the same date on which Plaintiff was shot in the eye by Defendant Archuleta, the City imposed a curfew order while thousands of individuals peacefully and lawfully marched and demonstrated against police brutality in Denver.

109.    The original curfew was imposed in all public places within the City, including streets and public rights-of-way, from 8:00 p.m. on May 30, 2020, to 5:00 a.m. on May 31, 2020, and from 8:00 p.m. on May 31, 2020, until 5:00 a.m. on June 1, 2020.

110.    During the curfew hours, "all persons" were "prohibited from using, standing,

sitting, traveling or being present on any public street or in any public place, including for the purpose of travel," with certain exceptions. However, there was no exception for constitutionally protected First Amendment activity.

111.    A violation of the curfew order was a criminal violation punishable by a fine up to $999.00 or imprisonment up to 300 days.

112.    The City's curfew was implemented by DPD officers as justification for targeting peaceful protesters (or people believed to be or associated with such protesters), who were doing nothing more than exercising their First Amendment rights to express themselves, redress grievances, and to support, associate with, observe and/or document others who oppose racial injustice and police misconduct and brutality.

113.    Plaintiff was not protesting at the time he was shot, but he was perceived as being a protester or otherwise associated with them because of the time and location at which he was shot, raising his hands above his head (associated with a common police brutality protester expression of "hands up, don't shoot"), and/or his statement, "we're all Americans."

114.    If the City had clear policies, guidelines, and sufficient training about the proper handling of peaceful demonstrations, crowd control, curfew enforcement, and the proper and safe use of less-lethal projectiles and munitions, then the Defendant Officers, specifically including Defendant Archuleta, would have known that they could not aim and fire hard projectiles, such as pepper balls, at people's heads and faces, and, in any event, that they could not use any type of force against a person, such as Plaintiff, who was unarmed, unthreatening, lawfully exercising his constitutional First Amendment right of free speech, not disobeying commands, and not committing any violent or potentially dangerous offense.

C.    **Plaintiff's Damages**

115.    As previously alleged, Defendant Archuleta purposefully aimed at Plaintiff's head and shot him in the left eye with a pepper ball.

116.    With the help of other citizens and civilians, Plaintiff was transported from the scene to Denver Health Medical Center where doctors performed emergency surgery on his left eye, determined that the eye would not regain functionality, and that it would eventually have to be removed from its socket.

117.    Plaintiff was only 21 years old at the time of the shooting with plans, experience, and talents geared toward culinary and visual arts.

118.    The physical loss of his eye will not only permanently alter the appearance of his face with costly cosmetic procedures and prosthetic implants to remedy his appearance, but the loss of sight will also permanently diminish his vision by, among other things, ending his ability to perceive depth and significantly restricting his peripheral vision.

119.    As a direct and proximate result of the intentional, excessive, unconstitutional, wholly unnecessary, and/or arbitrary actions of Defendant Archuleta, which occurred with the supportive and coordinated actions of the Defendant Officers, and the City's policies, practices, customs, and/or lack of supervision and training, which were the moving force and cause of the Defendant Officers' misconduct, Plaintiff suffered injuries, damages, and losses, which include without limitation permanent blindness and the loss of his left eye, permanent disfigurement of his face, permanent impairment from the loss of vision, loss of income in the past and future, loss of economic opportunity, loss of enjoyment of life, and great physical and mental pain and suffering.

## CLAIMS FOR RELIEF UNDER FEDERAL LAW, 42 U.S.C. §1983

120.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

121.     The First Amendment of the United States Constitution protects the freedom of speech, association, expression, press, and the right of people to peacefully assemble and petition the government to redress grievances.

122.     The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures and the use of excessive force in connection therewith. When restraining, detaining, and/or arresting a person, the Fourth Amendment protections only allow police officers to use the amount of force that is reasonable and necessary under the circumstances.

123.     The Fourteenth Amendment protects persons from deprivations of life (including loss of or injury to life), liberty, and property without due process of law, including substantive protections against arbitrary abuses of executive power.

124.     A municipality may be liable under 42 U.S.C. §1983 where a municipal policy or custom causes the constitutional violations, and the municipality's failure to adequately train its officers may form the basis of such municipal policy or custom.  *See City of Canton, Ohio v. Harris*, 489 U.S.  378, 388-90 (1989).

125.     The City, through its Chief of Police, Executive Director (or Manager) of Safety, and/or Mayor, had the ultimate decision- and policymaking power for the DPD and ultimate responsibility for adopting and implementing DPD policies and imparting such policies to DPD's police officers and agents acting on its behalf through training and supervision.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. §1983 – Violation of Fourth Amendment of the United States Constitution**
**Unnecessary, Unreasonable and Excessive Force**
**(Against Defendant Archuleta)**

126.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

127.     At all relevant times, Defendant Archuleta acted under color of state law and within the course and scope of his employment and/or agency as a law enforcement officer for the City.

128.     Plaintiff had protected Fourth Amendment interests against being unreasonably seized, injured, and victimized by the use of excessive force by law enforcement officers.

129.     A "seizure" for purposes of the Fourth Amendment to the U.S. Constitution occurs when an officer intentionally applies physical force to the body of person or show of authority to restrain his or her freedom to simply walk away.  *See, e.g., Torres v. Madrid*, 141 S.Ct. 989, 993 (2021); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *Fogarty v. Gallegos*, 523 F.3d 1147, 1155 (10th Cir. 2008).   Furthermore, the high-level use of force of an officer pointing a gun at a person constitutes a seizure as a matter law.  *See Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018).

130.     Whether the force used by police officers is unreasonable and thus excessive is determined by an objective analysis of the facts and circumstances that existed at the time the force was applied, including the severity of the suspected crime, whether an immediate threat was posed to the safety of the officers and others, and whether the suspect was actively resisting or evading arrest.  *Fogarty*, 523 F.3d at 1159-60.

131.     Reasonable officers at the time of the actions alleged herein would have been on notice that using less lethal munitions (such as hard rubber bullets and pepper balls) or "any other

type of pain-inflicting compliance technique" may constitute excessive force if applied under circumstances that failed to warrant such use of force. *Fogarty*, 523 F.3d at 1161-62.

132.    Defendant Archuleta seized the Plaintiff by purposefully aiming a pepper ball launcher at him and shooting him in the head and eye with a pepper ball, which blinded and incapacitated Plaintiff as Defendant Archuleta rode by in full riot gear on a police vehicle without any risk of harm, threat, or provocation from Plaintiff, without witnessing Plaintiff perpetrate any crime, and without Plaintiff attempting to flee or otherwise disobey any commands.

133.    The serious and incapacitating injury to Plaintiff's eye prevented him from leaving the scene, much less simply walking away, until paramedics arrived and transported him to the hospital emergency room.

134.    Such actions by Defendant Archuleta objectively manifested an intention to stop and restrain the Plaintiff because of Plaintiff's perceived participation in or association with those who were out protesting police brutality and misconduct and/or because of an unreasonable perception that Plaintiff somehow posed a threat to the Defendant or his fellow officers.

135.    Even if the Plaintiff's mere presence outdoors during the hours of a curfew could warrant stopping and citing him, Defendant Archuleta failed to question Plaintiff first about why he was outside, where he was going, and whether he was exempt from the curfew.

136.    Furthermore, the possible violation of a curfew, without more, failed to warrant shooting Plaintiff in the eye with a hard less-lethal projectile and permanently blinding, impairing, and disfiguring him.

137.    Even if Defendant somehow perceived a threat from Plaintiff when he raised both hands (empty of any weapon) in the air and shouted, "We're all Americans," any such perceived

threat was unreasonable under those circumstances. Visibly empty hands in the air are a sign of peace, non-violence, or surrender, and a statement about everyone being an American is not offensive, defamatory, threatening, or likely to cause harm to others by creating a dangerous situation or inciting a riot.

138.    Moreover, there was no rioting or active protests in the immediate area where Plaintiff was standing when he was shot by Defendant Archuleta because the Defendant Archuleta and his colleagues on the police vehicle had previously dispersed the protesters just before turning the corner onto Grant Street.

139.    Defendant Archuleta recklessly created the situation in which he used force.  He had sufficient time and opportunity to assess the situation and surrounding circumstances but failed to do so. Instead, he simply aimed and fired at Plaintiff's head as he rode safely down the street wearing protective riot gear on the side of a police vehicle.

140.    No use of force, much less shooting dangerous injury-producing projectiles at particularly sensitive body parts (head and eyes), was warranted against the Plaintiff under the circumstances that existed at the time. Accordingly, shooting the Plaintiff in the head and eye with a pepper ball was patently and objectively unreasonable.

141.    Defendant Archuleta's use of excessive, unreasonable, and unnecessary force to seize Plaintiff under the circumstances violated clearly established law and rights protected by the United States Constitution.

142.    Defendant Archuleta engaged in these actions intentionally, willfully, and wantonly, and demonstrated deliberate indifference to and reckless disregard for Plaintiff's constitutionally protected rights.

143.     As a direct and proximate result of Defendant Archuleta's unconstitutional acts and omissions, Plaintiff suffered permanent and disfiguring injuries, permanent impairment, and other damages and losses as previously alleged above.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. §1983 – Violation of Fourteenth Amendment of the United States Constitution**
**Unnecessary, Unreasonable & Excessive Force**
**(Against Defendant Archuleta)**

144.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

145.     Plaintiff had protected Fourteenth Amendment Substantive Due Process rights and interests against being unreasonably, arbitrarily, and intentionally harmed by the use of unnecessary and/or excessive force by law enforcement officers.

146.     Defendant Archuleta deprived Plaintiff of his Fourteenth Amendment due process rights by purposefully firing a pepper ball at Plaintiff's head and eye without any reason or provocation as Defendant Archuleta safely rode by in full riot gear on the running boards of a police vehicle.

147.     Because the Plaintiff was not committing any crime, fleeing, or otherwise threatening anyone, Defendant Archuleta had sufficient time for deliberation before choosing to purposefully aim and shoot the Plaintiff in his head and eye.

148.     Defendant Archuleta aimed his weapon, loaded with pepper balls, directly at Plaintiff's head and face—not at a part of his body that would be less likely to cause serious or disfiguring injuries or, even more prudently, at an area of the ground a safe distance from the Plaintiff's body—with the intention of causing, or with deliberate indifference to the possibility

31

that doing so would likely cause, serious bodily harm and injury to Plaintiff.

149.    Defendant Archuleta's actions were not only intentional, but also arbitrary and malicious under the circumstances given that he aimed and shot at Plaintiff from the safety of a police vehicle as it drove along the street and while Defendant Archuleta was dressed in full protective riot gear; shot at Plaintiff on the sidewalk where no active group of protesters, demonstrators, or rioters were located; and then left the scene without determining whether Plaintiff should be taken into custody or to a hospital for emergency medical care as indeed was the case here.

150.    Defendant Archuleta acted maliciously and/or with excessive zeal that amounted to an abuse of power, and he acted for the purpose of causing Plaintiff harm that was unrelated and unnecessary to any legitimate policing objective.

151.    Such callous and arbitrary actions by Defendant Archuleta, who is charged with serving and protecting members of the public—not arbitrarily shooting at them while driving by— represent conscious-shocking, intentional, and/or deliberately indifferent conduct directed at Plaintiff in violation of his right to life, the enjoyment of it, and liberty protected under the U.S. Constitution.

152.    As a direct and proximate result of Defendant Archuleta's unconstitutional acts and omissions, Plaintiff suffered permanent and disfiguring injuries, permanent impairment, and other damages and losses as previously alleged above.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. §1983 – Violation of the First Amendment of the United States Constitution**
**Infringement of Free Speech, Assembly, Association and/or Press**
**(Against Defendant Archuleta)**

153.    Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

154.    Plaintiff had protected First Amendment rights of free speech, expression, and association under the U.S. Constitution.

155.    Even though Plaintiff was not engaged in any active demonstration or protest at the time he was shot by Defendant Archuleta, he raised his empty hands in the air and shouted, "We're all Americans," as the police vehicle carrying Defendant Archuleta drove by Plaintiff.

156.    As previously alleged, nothing about Plaintiff's act of raising his hands above his head or stating that "we're all Americans" justified any use of force against him, much less the particular force applied by Defendant Archuleta.

157.    As previously alleged, raising one's empty hands above one's head is a sign of peace, non-violence, and/or surrender.  There is nothing threatening, offensive, or dangerous about it.

158.    As previously alleged, the statement, "We're all Americans," was completely innocuous.  It was not defamatory, threatening, or likely to create a dangerous situation. Furthermore, it was completely neutral as to Plaintiff's position or opinion about the police.

159.    Even if Plaintiff's statement could have been construed as a statement against the police and in favor of the protesters, Plaintiff still had a constitutionally protected First Amendment right to peacefully express himself and his opinions without suppression, punishment, or retribution by a state actor, such as Defendant Archuleta, for such expression or opinions.

160.    Defendant Archuleta violated Plaintiff's First Amendment rights by targeting and shooting him in the head and eye to suppress, punish, and/or retaliate against Plaintiff for

peacefully expressing himself and/or for being associated with those who were out protesting against police misconduct and brutality.

161.    As a direct and proximate result of Defendant Archuleta's unconstitutional acts and omissions, Plaintiff suffered permanent and disfiguring injuries, permanent impairment, and other damages and losses as previously alleged above.

## FOURTH CLAIM FOR RELIEF
### 42 U.S.C. §1983 – Conspiracy to Commit Violations of Constitutional Rights
### (Against All Defendant Officers)

162.    Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

163.    A conspiracy under §1983 occurs where there is concerted action in furtherance of an agreement, which may be implied or inferred from the circumstances.

164.    The Defendant Officers formed a tacit or implied agreement by their complicit and coordinated actions, mutual purpose, and by their words and/or conduct to deprive protesters and those perceived to be protesters of their First, Fourth, and/or Fourteenth Amendment right to peacefully associate and express themselves and their opinions (particularly expressions and opinions against police misconduct) without suppression, punishment, or retribution.

165.    The Defendant Officers' conspiracy was demonstrated by their actions and conduct immediately surrounding the shooting of Plaintiff when they fired pepper balls and other hard projectiles from 40 mm launchers at the heads and faces of individual protesters and groups thereof, including people who were fleeing and non-threatening.

166.    Plaintiff was among those targeted by the Defendant Officers because of his proximity to other protesters and/or the area of recent protests and because of his statement, "We're all Americans," which he shouted after witnessing the Defendant Officers' attacks against protesters.

167.    The Defendant Officers' conspiracy is further demonstrated by their failure or refusal to identify the person responsible for shooting Plaintiff during the DPD's Internal Affairs investigation, and through their uniform denial of their concerted acts of shooting fleeing and non-threatening protesters before and after shooting Plaintiff. In other words, because they were all engaged in concerted unconstitutional conduct as they patrolled Denver's streets from the same police vehicle, any one of them could be implicated in causing injuries to any number of other persons or protesters at the time of their patrol. Thus, they protected each other by refusing to identify any one of their members.

168.    As a direct and proximate result of the Defendant Officers' conspiracy, Plaintiff suffered permanent and disfiguring injuries, permanent impairment, and other damages and losses as previously alleged above.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. §1983 – Failure to Intervene In Ongoing Constitutional Violations**
**(Against All Defendant Officers Except Defendant Archuleta)**

169.    Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

170.    As relevant here, a claim for failure to intervene under §1983 occurs where a person's (1) constitutional rights were being violated by (2) a law enforcement official and (3) one

or more other law enforcement officers, who had a realistic opportunity to intervene to prevent the harm from occurring, failed to do so.

171.     Defendant Archuleta was at all times described in this Complaint engaged in a complicit, coordinated, and prolonged effort to deprive protesters and those perceived to be protesters, including Plaintiff, of their First, Fourth, and/or Fourteenth Amendment rights, as previously alleged.

172.     All of the other Defendant Officers, who were also present and part of the D4 Impact Team, were aware of this effort and had more than ample opportunity to intervene to stop it.

173.     Additionally, there were two higher-ranking sergeants on the D4 Impact Team, Defendants Hyatt and O'Neill, supervising the other Defendant Officers, including Defendant Archuleta while he was engaged in this prolonged effort.

174.     None of the other Defendant Officers of the D4 Impact Team intervened to stop Defendant Archuleta from targeting protesters/perceived protesters and aiming his pepper ball gun at their heads and faces, specifically including Plaintiff.

175.     As a direct and proximate result of the failure of the other Defendant Officers to intervene, Plaintiff was seriously injured in violation of his First, Fourth, and/or Fourteenth Amendment rights as previously alleged.

## SIXTH CLAIM FOR RELIEF
**Unconstitutional Policies, Customs, and Practices, Failure to Train, and Ratification
Resulting in Violations of Plaintiff's Constitutional Rights
(Against the City)**

176.    Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

177.    As previously alleged, Defendant Archuleta aimed and shot a pepper ball at Plaintiff's head and eye for no justifiable reason, thereby violating Plaintiff's constitutional rights under the Fourth, Fourteenth, and/or First Amendments to the U.S. Constitution.

178.    As previously alleged, Defendant Archuleta and the other Defendant Officers engaged in coordinated acts of targeting perceived protesters and shooting pepper balls and other hard "less lethal" projectiles at their heads and faces.  Furthermore, the other Defendant Officers, specifically including two sergeants, Defendants Hyatt and O'Neill, took no intervening action to stop Defendant Archuleta or the other officers who were part of the D4 Impact Team from shooting at the heads and faces of perceived protesters.

179.    The DPD has a long-standing custom of using grossly disproportionate force against peaceful protesters, going back to at least 2011, and continuing well past the George Floyd protests of May and June 2020. The City has taken no action to curtail or rectify this unconstitutional custom, and City leaders have even praised the DPD for these customs.

180.    The Defendant City has a policy, practice, and/or custom of tolerating violations of constitutional rights by its police officers, which prompted the Defendant Officers to engage in such actions that targeted perceived protesters, and which allowed and/or prompted Defendant Archuleta to use excessive and completely unnecessary and unjustified force against the Plaintiff.

181.    The City's written policies are facially unconstitutional. The City failed to adopt, revise, implement, enforce, and/or properly train its officers, including the Defendant Officers, on policies and practices that delineate the constitutional limitations of force, the circumstances under

which force should be used, the type of weapons that are appropriate under the circumstances, including the use of less-lethal weapons, and how such weapons should be used to prevent or minimize unnecessary harm and constitutional violations to the citizenry, especially in the context of protests and crowd control.

182.    The City further failed to properly train its officers, including the Defendant Officers, on distinguishing illegal or threatening behavior from merely demonstrative behavior expressing discontent with the police or other persons or groups.

183.    Based on earlier protest movements, such as the "Occupy" protests, a long history of claims and complaints of excessive and inappropriate force by its officers, and the policy deficiencies identified by the OIM, the City was aware that such constitutional violations would be certain, yet still failed to adopt proper policies and/or provide proper training on the constitutional limitations of targeting individuals and using force against them to suppress protected First Amendment expression and activities.

184.    The City's unconstitutional policies, practices, customs, and/or training failures in connection with First Amendment protections were further exemplified and ratified by its issuance of a curfew that provided no exceptions for activities protected by the First Amendment.

185.    Accordingly, the City adopted an official policy of targeting protesters (and those perceived to be or associated with protesters) during the curfew hours, while not targeting non-protesters (or those who appeared not to be protesting).  This was intended to further suppress protected First Amendment activities, including the right to free speech, expression, association, and assembly, and it violated the First Amendment.

186.    The City further failed to provide any training or guidance to its police officers

38

about how to properly enforce curfews, such as not randomly shooting or attacking people simply because they were outside after curfew hours, recognizing and distinguishing peaceful protected speech and expression as opposed to non-peaceful and violent rioting, first stopping and questioning people about why they were out after curfew, and then issuing appropriate citations rather than assuming a violation and using injurious force against them.

187.   The City, through its policymakers, further ratified the constitutional violations against Plaintiff by publicly praising the actions of its officers and their handling of the protests in the days that followed, by allowing its officers to continue engaging in such unconstitutional conduct despite internal recommendations to the contrary and despite a federal court order enjoining such conduct, and by failing to prosecute or otherwise properly discipline Defendant Archuleta and other officers who committed similar violations.

188.   The City's policies, practices, customs, failure to train, failure to discipline, and ratification by its final policymakers, were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of Plaintiff's constitutional rights.

189.   As shown by OIM evaluations and recommendations in the aftermath of the 2020 protests, OIM evaluations and recommendations that followed earlier demonstrations, and other examples of police misconduct by officers of the DPD over the past decade and beyond, the need for proper policies, practices, training and supervision of officers on the constitutional limits of force, including how to properly handle non-violent citizens and protesters, demonstrations, curfews, and crowd control, was so obvious and lacking and so likely to result in the violation of constitutional rights, that the City was deliberately indifferent to the need.

190.   As a direct and proximate result of the City's unconstitutional policies, practices,

customs, failure to properly train and supervise its officers, and its acts and omissions in relation thereto, the Defendant Officers, specifically including Defendant Archuleta, believed they could target protesters and perceived protesters by using less lethal weapons against them in ways that were certain to cause pain and inflict serious injuries

191.    Consistent with the City's unconstitutional policies, practices, customs, and failure to properly train and supervise its police officers, Defendant Archuleta, with the support and lack of intervention by the other Defendant Officers, targeted Plaintiff and shot him in the eye with a pepper ball because he was perceived to be a protester or otherwise associated with protesters who were or had been in the immediate area; and as a result, Plaintiff suffered permanent and disfiguring injuries, permanent impairment, and other damages and losses as previously alleged above.

## REQUEST FOR PUNITIVE DAMAGES
### (Against the Defendant Officers)

192.    Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

193.    Federal courts have held that punitive damages are available in actions for constitutional violations under §1983 where a defendant's conduct is shown to be motivated by evil motive or intent, or when the conduct involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 56 (1983); *Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1308 (10th Cir. 2003).

194.    Defendant Archuleta purposefully and intentionally aimed his weapon at Plaintiff's head and fired at him as he and the other Defendant Officers rode by on a moving police vehicle. The circumstances, as previously alleged, indicate that the shot was intended to hit, restrain, and

injure Plaintiff, or at least that the shot was taken with reckless or callous indifference to Plaintiff's constitutional rights.

195.    The other Defendant Officers were complicit in Defendant Archuleta's conduct and even participated in the same or similar conduct immediately before and after Plaintiff was shot in the eye with a pepper ball.  The other Defendant Officers did nothing to stop Defendant Archuleta from engaging in the actions that resulted in Plaintiff's severe eye injury, and they protected Defendant Archuleta after-the-fact by failing or refusing to identify him as the officer responsible for shooting and permanently injuring Plaintiff.

196.    Plaintiff accordingly requests an award of punitive damages as allowed under federal law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Jax Feldmann, respectfully requests that this Court enter judgment in his favor and against the Defendants, jointly and/or severally, as follows:

a.   general and compensatory damages in an amount that will fully and fairly compensate Plaintiff for his injuries, damages, losses, and violation of his federal constitutional rights available pursuant to 42 U.S.C. §1983 and any other applicable federal law;

b.   punitive damages pursuant to federal law as punishment and deterrence against the commission of future such conduct;

c.   pre- and post-judgment interest;

d.   reasonable attorneys' fees, expert witness fees, and the cost of this action, pursuant to 42 U.S.C. §1988 and any other applicable federal law; and

e.   any other relief the Court deems proper and just.

**PLAINTIFF DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

Dated this 25th day of January, 2022.

Respectfully submitted,
**BEEM & ISLEY, P.C.**

 *s/ Clifford L. Beem*
Clifford L. Beem
A. Mark Isley
Danielle C. Beem
730 17th St., Ste. 850
Denver, CO 80202
Phone: (303) 894-8100
Fax: (303) 894-8200
clbeem@beemlaw.net
amisley@beemlaw.net
dcbeem@beemlaw.net

**BAUMGARTNER LAW, L.L.C.**

 *s/ S. Birk Baumgartner*
S. Birk Baumgartner
Adam R. Yoast
300 E. Hampden Ave., Ste. 401
Englewood, CO 80113
Phone: (303) 529-3476
Fax: (720) 634-1018
birk@baumgartnerlaw.com
adam@baumgartnerlaw.com

*Counsel for Plaintiff*

Plaintiff's Address:
c/o Baumgartner Law, LLC
300 E. Hampden Ave., Ste. 4041
Englewood, CO 80113